ANDRÉS MASA TORRES, ETC., ET AL., Plaintiffs and Appellees, *v.* PUERTO RICO WATER RESOURCES AUTHORITY, Defendant and Appellant.

No. R-66-403.        Decided February 12, 1969.

*José Antonio Arabía* and *Luis A. Lugo, Jr.*, for appellant. *Castro & Castro* for appellees.

First Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Blanco Lugo, Mr. Justice Rigau, and Mr. Justice Ramírez Bages.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

The Puerto Rico Water Resources Authority appeals from the judgment of the Superior Court, San Juan Part, which ordered it to pay to Israel Masa González the sum of $57,220, to his parents the sum of $5,000 for the mental anguish suffered by them, and $6,000 for attorney's fees by reason of the serious injuries he suffered upon coming in contact with the primary current in a transformer on which he was working.

Appellant's assignments seek, as a whole, to challenge the weighing of the evidence made by the trial court and particularly in not concluding that appellee and his employer caused the accident in question.

In this case it is evident from the examination we made of the record that the negligence of both litigants, although in different degrees, caused the accident which gave rise to this suit. Therefore, the judgment should be modified and the amount of damages imposed on appellant reduced.

The trial court concluded that:

1.—Because a house in the Fourth Section of Villa del Rey Development did not receive electric current, Mr. Canetti, appellant's employee in charge of the inspection of underground systems, went to determine the cause of that defect on December 1, 1964. Prior to that date, the firm Carrero & Tristani had finished the electric installation of said section,

including the T-18 transformer and the same had been inspected and approved by the aforesaid Authority. The latter had said transformer under its control which it closed with a padlock whose keys were kept by the Authority.

Appellee, Israel Masa González, has been an employee of Carrero & Tristani for seven months. He began as a laborer digging ditches and placing cables therein and then as electrician's helper in dead lines. He worked in bases and transformers without current.

When Canetti noticed that in the T-18 transformer certain cables which had been replaced by Carrero & Tristani as a result of a former current failure were not connected, he went to see Mr. Collazo, Carrero & Tristani's foreman, but he did not find him and talked with Mr. Díaz, an employee of Carrero & Tristani, who told him that he would send a man to do the work. The man he sent was the plaintiff. Canetti took him in a vehicle of the Authority to the T-18 transformer in order to perform the work. When they arrived at the place where the transformer was Canetti used a key and opened the padlock of the cabinet and the two doors. He took out a drawing and explained to Israel what had to be done, that is, to connect some cables at the right side of the transformer, which side was only 13 inches wide.

The trial court concluded that:

"Canetty [sic] turned off some of the disconnecting switches on the left section of the transformer which had high voltage, thus leaving the right section of the transformer where plaintiff was going to work without current. Canetty [sic] left in its place, however, one of the switches of the left section, leaving a third part of that section with high-voltage current.

"Canetty [sic] left both doors open and Masa crouched and began to work. The work consisted in inserting some cables through a small opening, and some minutes later, while Masa, in that position tried to insert the cables, he touched with his left knee the disconnecting switch on the left side of the trans-

former, which had high-voltage current .... An explosion occurred and Masa fell backwards unconscious, having suffered serious burns. Mr. Canetty [sic] was standing a few feet away from Masa during the occurrence.

"   .   .   .   .   .   .   .

"The accident which occurred could have been avoided if the employees of the Authority had left the T-18 transformer entirely without current before Masa worked in it, which could have been easily done and in a few minutes. The accident could also have been avoided by keeping closed the left door of the cabinet where the high-voltage section was or by using the proper protecting equipment.

"The Authority was negligent in performing the original inspection of the lines and of the T-18 transformer, and not discovering the defects which existed in that transformer. Mr. Canetty [sic] was also negligent in having a person who did not belong to the Authority's personnel carry out the repairs in question within the transformer, in violation of the rules of the Authority, particularly without ascertaining first that he was using, at least, a licensed electrician or one with the necessary ability for the work contemplated.

"But Canetty [sic] was even more negligent in indicating to Masa that there was no current in any place of the cabinet.

"Canetty [sic] in his testimony sought to explain that he meant that there was no current in the right side (where the work was to be done), and that he told Masa that there was current on the left side. But even if that were true, since the cabinet involved was only 36 inches wide, the proximity of the danger was such that Canetty [sic] should not have permitted the work to be carried out without disconnecting the whole current of the transformer.

"As a consequence of the accident the plaintiff, Israel Masa, was unconscious for several hours, and in order to save his life mouth to mouth artificial respiration was administered to him. He suffered horrible burns and was hospitalized for 5 months and 18 days at the Industrial Hospital.

"   .   .   .   .   .   .   .

"The burns were so serious that the patient was seriously ill for two or three months, and it was necessary to have special nurses to take care of him 24 hours a day for more than five

months—(until May 11, 1965)—said nurses having been considered indispensable from the medical point of view. It was necessary to administer blood transfusions and plasma on repeated occasions.

"Masa was submitted to five operations in order to perform some skin grafting and skin was removed from 20% of his body for the grafts, by means of the dermatome—a razor which vibrates similar to that used by barbers for cutting the hair—which leaves underlying tissues exposed. The treatment was very painful, since the burns had to be cleaned for the grafting; and the patient was always uncomfortable, since he could not even turn his body.

"    .    .    .    .    .    .    .    .

"The court examined the plaintiff, Israel Masa, and at the time of the trial he showed horrible scars all over his body, the worst being on the left knee, on the right shoulder and arm, and on the legs. Plaintiff's photographs admitted in evidence, taken a few days before the trial, represent accurately the present aspect of the scars.

"As a result of the accident plaintiff Masa has the left leg ankylosed, with a 30-degree flexion limitation of a possible 135 degrees, and has some weakness in the right arm. He walks with the knee extended and with an evident limp. The soft tissues in the left leg are atrophied, especially over the knee. The skin of the right thigh is atrophied, but there is no limitation of flexion.

"Aside from the foregoing, Masa has recovered his weight and at present is in an apparent healthy condition.

"After he was discharged from the hospital, Masa continued to receive ambulatory treatment and was definitively discharged on February 16, 1966, the State Insurance Fund having awarded a disability equivalent to the loss of 50% of the general physiological functions.

"    .    .    .    .    .    .    .    .

"(a) The reasonable value of the hospitalization of Israel Masa at the rate of $27 a day during the period he was hospitalized, including medicines, plasma, blood, operating room, anesthesia, etc., but without including special nurses, amounts to $4,536.

"(b) The reasonable value of the three daily nurses at the rate of $44 a day amounts to $7,084.

"(c) The reasonable value of the medical services incurred by said plaintiff, including the operations amounts to $2,500.

"(d) For loss of income from the date of the accident until the plaintiff was definitively discharged, $3,100.

"Taking into consideration the serious physical damages and mental anguish and suffering sustained by plaintiff, as well as his present physiological disability, the court believes that a compensation of $40,000 is fair and reasonable for said damages.

"At the time of the accident coplaintiffs, Andrés Masa Torres and Francisca González, Israel's legitimate parents, were living with their son in Aguas Buenas. It was stipulated by the parties that they suffered the anguish normally suffered by a father and a mother as a result of the occurrence of an accident such as the one of the case at bar, to a son of that age. The court fixes the compensation which said coplaintiffs should receive jointly in the amount of $5,000."

We agree with appellant that the evidence established that: the electrical facilities of a development project are constructed by private electric contractors and not by the Water Resources Authority; that the electric contractors guarantee the electrical facilities constructed by them during a period not less than one year, since the same are inspected and approved by the Water Resources Authority; that any defect which might appear in said installations during the aforesaid period should be repaired and corrected by the electric contractor; that the electric installations of development projects are inspected by the Authority to determine whether the same comply with the technical requirements established by said Authority and the National Electrical Code; that about October 19, 1964 the Authority had inspected the electric installations constructed by the electric contractor Carrero & Tristani in block 4V of Villa del Rey Development, including lots 1 to 16 of said block; that it was found that said installations complied with the technical requirements aforementioned; that the T-18 transformer

which was a part of the electric installations inspected and approved in the fourth section of Villa del Rey was damaged when it was put to work and as a result thereof the cables of its secondary system were changed by Carrero & Tristani's workers, the new cables which were installed being improperly connected.

With respect to how the accident occurred, the trial court considered the conflicting testimonies of the prejudiced party, Israel Masa González and that of Canetti.

The victim testified that he had only worked for Carrero & Tristani some eight months as electrician of dead lines, that is to say, he connected cables without current in bases, switches, and transformers; that Canetti invited him to connect some cables in the T-18 transformer which Canetti opened with a key of the padlock which closed the two doors of the device; that Canetti did not carry any rod to open the disconnecting switches from the transformer leaving it thus without current; that the witness prepared a rod at Canetti's request, consisting of a board and a nail; that then Canetti disconnected the three switches from the transformer and ordered him to connect the loose wires; that when the victim expressed his fear of the current, Canetti answered "Forget it, there is no current"; that "I touched with his pliers and there was no current in that place"; that he crouched to connect both cables. What happened then, according to the victim, appears from the record thus:

"A. Then, I began to connect; I started to connect the cables, but, since the opening of the connector was small . . .

Q. The opening of what?

A. Of the connector, it was small.

Q. The opening of the connector was small.

A. Then, I tried to insert it, but since the cable has about six strands, it got stuck, it did not go through.

Q. You tried to insert it, but, since the cable has about six strands, it got stuck and did not go in well. And that six-strand

cable, it had to be inserted through that opening of the connector?

A. Yes, sir.

Q. And it was a very small opening?

A. Yes, sir.

Q. And what happened?

A. I had tried two or three times to insert it, but I was a little tired and moved the knee towards the right side . . .

Q. Towards the right side, or the left?

A. Towards the left.

Q. Why?

MR. LUGO:

Because he was a little tired, that was the word.

A. Yes.

.        .        .        .        .        .        .        .

MR. CASTRO FERNÁNDEZ:

Q. You were uncomfortable in that place. And meanwhile you were trying to insert those strands. Do you say they are six?

A. I am not sure. It has, more or less, six or seven.

Q. What happened?

A. Then I received the shock.

Q. What?

A. With the disconnecting switch. I moved the knee towards the left side and then and there I received the shock.

MR. LUGO:

Q. Did you bend the knee towards the left side?

A. No, I moved it and from that instant I do not know anything more about that."

When he was confronted with his statement signed at the hospital the day following the accident, he answered in an evasive manner with respect to his signature and initials therein. Later his counsel admitted that the signature in the statement was that of the witness after the latter recognized his signature in some interrogatories.

On cross-examination, however, the victim testified that: he had worked before for Carrero & Tristani and not only for the eight months prior to the accident; that in order to

become an electrician he had received training from said company but that "I was not given any training on current, they taught me the work I was going to do and how to perform it"; that his employer "handled" wires to be utilized in the conduction of electricity, transformers, bases which are places "where the secondary cables and current connections of the houses" are placed in order to service electricity to them; that he installed the bases and the wires from the base to the houses and from the base to the transformers and from one transformer to another, that he performed that work in the T-18 transformer where he had worked before the accident and where an explosion occurred as a result of a defective connection of secondary cables. He insisted that when Canetti appeared the latter asked whether there was anybody who connected cables and the witness told him that the witness was in charge of connecting cables for Carrero & Tristani; that he knew that the cables in the T-18 transformer had to be connected and that he believed that that was "Carrero & Tristani's responsibility" and for that reason he went. He said that he knew what primary cables are, that they are thick cables; that there are two compartments in the transformer; that the one on the left has the primary system of electricity and the right one has the secondary where some wires are joined to others attached to the same box and the other end of the wire is underground going to the bases or transformers; that the disconnecting switches are on the left side of the transformer which side is separated from the other by "a thin piece of board"; that those disconnecting switches are opened with a hook and not with the hand because "It is assumed that it has current," which current comes through the cable called primary and enters into the transformer through the bottom; that he had previously seen how a disconnecting switch had been opened in the aforesaid transformer with a rod; that in addition to the rod, Canetti slipped primary gloves

on his hands, which "I know them to be two rubbers, that part is leather and part rubber . . . in the same glove . . ."; that those gloves are used to work with current; that when those disconnecting switches are opened part of the transformer is left without electric current; that he used the pliers to test the electric current in the right side of the transformer where he was going to work.

Witness Canetti testified that he went to the project to attend a complaint that a house in the aforesaid section did not receive current. He found that some secondary cables had not been connected to the T-18 transformer. Weeks before, when electricity was given to the block in that section, there was an explosion in a transformer base at 50 or 60 feet from the transformer due to defective installation of the cables. Three employees of Carrero & Tristani repaired it but did not connect the secondary cables to the transformer. He went to look for Carrero & Tristani's foreman in charge of the work so that he would perform the connection. He did not find him but he met Collazo's assistant, a man named Díaz, and the latter sent Masa, and Masa went with the witness and another in a vehicle of the Authority. When they arrived at the transformer the witness took out a drawing, opened the doors of the device and explained to the victim "what had happened and how the cables were and where they were and which were the cables, I opened the left compartment where the primary was, I disconnected the switches and the fuse so that the right part, where the unconnected cables were, would remain dead." The witness put on primary gloves and disconnected the switches of the left side "so that the right part, where the unconnected cables were, would remain dead . . . . I explained to Masa that the only thing he had to do was to connect the cables which had been left unconnected, to connect them. He told me that he knew how and proceeded to connect them. I explained to Masa that there was current in both sides;

that in the side where he was going to work we were going to cut off the current so that that compartment of the right side would remain without current. He told me that there would be current anyhow. I told him that there would be a minimum of current, that the rod and the disconnecting switch of the left side would be dead and that the disconnecting switch of the right was the only one left with current. I remember that he told me first that many parts would remain with current. I remember that, because then I proceeded to open the other disconnecting switches so that only one third would remain with current and thus two thirds would be eliminated. When he was about to introduce the cable, at that moment there was an explosion, Masa fell backwards, by my side, there was another employee of Carrero & Tristani towards the left side, at about seven feet from the cabinet, Sierra, and Castro Cabezudo at about twenty feet from the cabinet. The three of us removed Masa from the cabinet; Castro Cabezudo held all his body, Sierra administered artificial respiration, and I went running to look for the station wagon which was at about forty feet from the cabinet. I brought it, we put Masa in the station wagon; Castro Cabezudo drove it; I went in the back; we put Masa on the seat and went to the hospital."

The accident occurred after Masa had connected well one of the secondary cables and while he was trying to connect the second. Canetti said that the two doors of the transformer were left open and were open when the accident occurred. He did not close one because to connect the secondary cables "Was a work of seconds. It took longer to close the door than to insert the cable." He testified that he told Masa "that where we are going to work there is no current in any place"; that the work could be performed with the left door closed. When he was asked why they did not close it he answered, ask Masa; that they could disconnect the

primary current in another transformer at a distance of 400 or 500 feet.

Appellee's expert, Miguel Ángel Mir, testified that the current in the primary part of the transformer in question was not less than 1,200 to 1,400 volts and 120 in the secondary—it was dangerous for human life. He testified that in order to avoid the accident two safety measures should have been taken—ascertaining that there was no energy in the transformer by disconnecting the switches in other transformers at both extremes of the one where the work was to be performed—they only had to walk a short distance. He added, as a second measure that "in addition to using the proper instrument and the gloves, etc., the other very important measure would be, that when one has a person working, a watchful eye should be kept on him, because any tool may slip off or anything, without anyone watching and risk is assumed."

Although in his direct examination he inferred that the care and inspection of the lines already with current up to the inlet in each case corresponds logically to the Authority because in fact they put padlocks and seals so that nobody could interfere, but on cross-examination he admitted that if there is any defect in the electric service of a development within the term guaranteed by the contractor, the latter should repair it; then he said that the responsibility of repairing the defect which existed in this case was incumbent upon the Authority because it had already served the current, and upon the contractor because it was probably within its guarantee; that when electricity is disconnected in a posterior transformer and in another, the area served by the transformer where work is to be performed is left without service for a short time. He testified that since the defect in this case was so simple the repair thereof was incumbent upon the party which has jurisdiction over the system, and that is the Authority. He added that "I dare to say that it

is safer, because the Water Resources Authority has all the equipment and all the means, and the know how." As to the warning concerning current given by Canetti to Masa before the latter began to work in the transformer, the witness stated his view that "It is assumed that he should be warned that there is no current in one place, but that there is in the other, and he should be warned of the voltage, because it is very important if he is going to work in the secondary, to tell him why there is no current, and he should be told that there is in the primary, because then he puts his subconscious to work and takes precaution. But it does not suffice to tell him that there is no current, the lid should be closed because he may be distracted and may suffer an accident. It is in the cases of the engineers themselves who know and have suffered fatal accidents due to that"; that such a system, from the point of view of safety "is poor, you know." So much so that he would not work under such conditions.

Mr. Blanco Pi testified that "it is stipulated that the contractor, during the year after the lines are connected, during all that year, is under the obligation to repair any defect that may exist there, or otherwise he has to pay the Water Resources Authority to perform the work for him. Normally the contractor decides to perform the work, because the work is more expensive if performed by the Authority." He testified that he did not agree with Mir's opinion that it was incumbent upon the Authority to connect the cables under the circumstances of this case. To that effect he said that "Well, not necessarily because if the Water Resources Authority, on each occasion, every time that a contractor performs a defective work, is going to correct it, then, in point of fact it would be preferable to do the work from the beginning, that is, it is not a rule . . . . Definitively, it corresponds to the contractor, and he performs it, or pays for it. That is definite . . . . He has to request it. He has to give him a letter. There is a form he has to fill

out requesting that particular work." He testified that upon disconnecting the secondary cables, 15 or 25 houses served by that base would be left without electric current. The following examination of this witness by the trial judge deserves consideration:

"Q. Do you believe that the measures taken when that box or cabinet was opened were the adequate measures, or the adequate care to work in that place, or could other measures be taken?

A. Well, other measures could have been taken for greater safety.

Q. Would you personally work in such a place under those conditions?

A. Well, in effect I supervise personnel and in the Authority the personnel works every day in conditions even more dangerous than that one.

Q. And what do you do when you have to put some worker to work on one of those transformers?

A. I, in fact, believe that in this case there was an accident; probably a slip of the person who was working and it seems that his foot went off and struck the disconnecting switch.

Q. But, the question is, what measures do you take when you are going to work, or are going to put someone to work on a transformer like that?

A. In this case, the extreme safety measure which I would have taken is that I would have disconnected the cable on the other side.

Q. When you say extreme, that is not what you usually do, that is, what is usually done?

A. In point of fact, for the kind of work which was to be performed it was not necessary to disconnect the other side, but that would have been the extreme safety measure."

He said that among persons like him it is not a practice to disconnect the current in cases like this one because "every company which sells electricity has the problem of maintaining the service and giving continuity to the service, that is, that the service should be maintained; then every day the Authority carries out work which entails risks. That is, in

the work the correct thing would be to cut off the current, but if you have to leave a number of consumers without current for a certain time, then, you try to make the interruption as short as possible, and work which in effect can be performed with a greater safety measure, then you do not resort to the extreme of disconnecting all the electricity because of that."

From the foregoing we conclude that:

1.—Said appellee had received training in, and performed, installation of electric lines, and mounted bases and transformers which he knew; he was acquainted especially with the transformer which caused the accident in this case; he knew that the cables in the T-18 transformer had to be connected and that he believed that that was "Carrero & Tristani's responsibility"; for that reason he went. He said that he knew what primary cables were; that they are thick cables; that there are two compartments in the transformer; that the left one has the primary system of electricity and the right one the secondary where some wires are joined to others attached to the box and the other end of the wire is underground going to the bases or transformers; that the disconnecting switches are on the left side of the transformer; that when those switches are opened, part of that transformer is left without electric current.

2.—Although the maximum precaution consisted in cutting off the primary current in the transformer in question, disconnecting switches in other nearby transformers thereby interrupting the service to a great number of houses, the fact is that it was sufficient in this case to have maintained the left door of the transformer closed, thus avoiding any contact with the disconnecting switch of the primary current which was not disconnected.

3.—In cases where a defect occurs in an electric installation of a development within the term guaranteed by the

contractor, the latter is under the obligation to correct it. For those purposes, however, it is incumbent upon the Authority to make the facilities available—to open the transformer in this case—where the repair work is to be performed. The obligation to leave the working area without current corresponds to the Authority but in order to avoid causing unnecessary delays to many consumers of the service, the Authority and the contractor should agree as to the place, time, and extension of the interruption of the service and both should see that all such precautions be taken—the closing of the door of the right side of the transformer in this case—as may avoid that someone may be injured in the course of performing the repairs. *Cf. Widow of Dávila* v. *Water Resources Auth.*, 90 P.R.R. 316, 322 (1964) ; *Rosario Crespo* v. *W.R.A.*, 94 P.R.R. 799 (1967).

4.—Knowledge of the foregoing precaution should be attributed to appellee since he knew that in that place there still was dangerous current. He merely ascertained with some pliers that there was none in the right part of the transformer where he was going to work in a job which had to be performed by the contractor and not by the Authority.

5.—Although appellee, in trying to perform the work of again connecting the secondary loose wires to the transformer in question, was not an employee of the Authority nor did he act for the latter's benefit, he acted for his employer, Carrero & Tristani, and therefore, the safety rules of the Authority did not benefit him directly. It is no less true that the Authority was negligent in not ascertaining whether appellee was duly qualified for that work and in not taking the necessary precautions to prevent appellee from coming in contact with the primary cable of the transformer, as it happened, particularly when, after opening the transformer, its employee Canetti gave instructions to appellee on the work to be performed and informed him of, and he saw, the

switches which he disconnected; but Canetti did not close the small door to the left which could have avoided any contact by appellee with the primary cable which was not disconnected. *Widow of Dávila, supra, Rosario Crespo, supra.*

6.—Canetti admitted having told appellee, after opening the doors of the transformer and opening the disconnecting switches by virtue of which the part of the transformer where appellee was going to work was left without current, that "There is no current in any place." Although the latter knew the transformer, the types of current therein, and that after opening the disconnecting switches only part of the transformer was left without current, it is not less true that he had only worked in the installation of electric systems without current. So that such statement could have led appellee to be less conscious of the fact known by him that the left part of the transformer was left with current and of the need to isolate himself from it by the simple precaution of closing the door of that side of the transformer.

The trial court awarded, among other recoverable damages, "The reasonable value of the three daily nurses at the rate of $44 a day," that is, the amount of $7,084, plus "medical services incurred by said plaintiff including the operations," that is, the amount of $2,500.

The evidence produced with respect to these damages consisted of the testimony of a physician to the effect that "He had nurses in three shifts until May 11, 1965 when the special nurses with shifts from three to eleven and eleven to seven were discontinued. . . . Then he had special nurses from seven to three until he was discharged." When asked about the reasonable value of these services and whether such services were indispensable, he answered that "Well, special nurses are paid, I believe fourteen dollars on day shifts and $16 on night shifts, which would be forty-four daily . . . . Obviously it was indispensable because those nurses were paid by the Insurance Fund."

With respect to the value of the medical services rendered, the aforesaid witness testified that "That is a somewhat difficult question to answer, sir, because I have never been in a position to collect this from a private patient, I imagine that it would be from two to three thousand dollars."

■ On repeated occasions we have said that the amount of damages actually suffered as the ones previously recited, should be established with reasonable certainty and accuracy, without resorting to speculations. *Rodríguez* v. *Serra*, 90 P.R.R. 755, 758 (1964); *Seda* v. *Miranda Hnos. & Co.*, 88 P.R.R. 344, 351 (1963); *Rivera* v. *Martínez*, 26 P.R.R. 692, 696 (1918); *González* v. *San Juan Light & Transit Co.*, 17 P.R.R. 115, 119 (1911).

■■ In our opinion, the need of the aforesaid nurses was not established since the fact that they were paid by the State Insurance Fund did not constitute the reasonable accurate proof of its need. The evidence of the value of the medical services is speculative since it consists in the weighing of said value by a person without the necessary experience to make it.

Since we consider that the amount awarded for attorney's fees is excessive, the same should be reduced to the amount of $2,000 which is the reasonable one under the circumstances of this case.

In view of the foregoing, we conclude that the accident which caused the serious injuries suffered by appellee was due, in 66 2/3% to appellant's negligence, and in 33 1/3% to appellee's own negligence.

■ Therefore, the judgment rendered in this case by the trial court should be modified in order to (1) eliminate the award of $9,584 for medical expenses and nurses; (2) reduce the amount awarded for attorney's fees to the amount of $2,000; and (3) reduce in 1/3 the amount of the other dam-

852

ages imposed on appellant in favor of appellee and his father. Thus modified it will be affirmed.[1]

---

[1] The Legislature should consider the convenience of approving legislation authorizing the courts to make pronouncements to pay indemnity for damages to public welfare institutions, and to the State Insurance Fund in addition to the provisions of § 31 of the Workmen's Accident Compensation Act (11 L.P.R.A. § 32), the expenses incurred in the treatment of injured persons, including fees for medical services, regardless of whether they appear as parties to the suit.